# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

JOSEPH SNYDER,          )
                                    )
          Petitioner,        )
                                    )
          vs.                  )      Case No. 13-0459-CV-W-DW-P
                                    )
LARRY DENNEY,          )
                                    )
          Respondent.     )

## OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS
## AND DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner, Joseph Snyder, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254 on April 30, 2013, seeking to challenge his 2008 convictions and sentences for first degree murder, two counts of attempted first degree murder, three counts of armed criminal action, and first degree burglary, which were entered in the Circuit Court of Boone County, Missouri.

The petition raises five grounds for relief: (1) that the trial court erred in allowing a witness for the state to testify about petitioner's invocation of his right to counsel as an affirmation of his guilt; (2) that trial counsel failed to allow him to testify at a motion to suppress hearing; (3) that his written and verbal statements were coerced; (4) that trial counsel failed to question or impeach certain witnesses; and (5) that trial counsel failed to object to certain hearsay testimony. Respondent contends that grounds 1 and 2 are without merit and that grounds 3, 4, and 5 are procedurally defaulted.

## SUMMARY OF THE FACTS

On direct appeal, the Missouri Court of Appeals summarized the facts as follows:

> In October 2004, [petitioner] was charged in Warren County Circuit Court with, *inter alia*, murder in the first degree. On January 4, 2005, [petitioner] filed a motion for change of venue as a matter of

right, which was granted; the case was transferred to Boone County Circuit Court.

The theory of the State's case against [petitioner] was that on the evening of September 19, 2004, [petitioner] and Curtis Martin unlawfully entered the home of Charles and Alice Windmann in Wright City with the intent to cause the death not only of Mr. and Mrs. Windmann, but also of their son James Windmann.

At trial, the State demonstrated that when [petitioner] and Martin entered the Windmann's home, it was vacant and that they lay in wait for all three Windmanns to arrive. Shortly thereafter, Charles, Alice and James Windmann pulled into the driveway of their home, and Charles then entered the home while Alice and James cleaned trash out of their van. After Charles entered the home, [petitioner] stood up from his crouching, hidden position and shot Charles with a shotgun, killing him.

Alice and James Windmann heard the shot from outside, and when Alice went up to the home to inspect what was happening, she saw two men inside. Alice told James, "Oh, my God, I'm afraid your dad's been shot," and she asked him to get his car keys and to drive the two of them away. Alice and James traveled to a neighbor's house, where they called 911.

[Petitioner] knew the Windmanns because James Windmann had been involved in a romantic relationship with [petitioner's] wife, Jamie Snyder, prior to [petitioner's] marriage to her. Jamie Snyder and James Windmann had a daughter named Taylor Windmann. After their relationship ended James moved into his parents' home. Jamie Snyder kept primary custody of Taylor, with James receiving visitation rights and providing child support.

After Jamie Snyder married [petitioner], James Windmann started to experience difficulties obtaining visitation with Taylor, and was forced to seek court orders to enforce his parental rights. During this time period, Jamie Snyder made accusations that James Windmann had sexually molested their child; these allegations were later found to be unsubstantiated.

In 2004, [petitioner] began to speak to friends and family regarding the "problems" he was having with James Windmann, and how [petitioner] desired to have "custody" of Taylor Windmann. At that time, [petitioner] expressed the thought that he could obtain custody of Taylor if something bad happened to her dad, James Windmann.

At first, [petitioner] thought that if he planted drugs on James Windmann, this would be sufficient to allow him to obtain custody of Taylor. [Petitioner] later began speaking of murdering James Windmann instead.

Sometime in June of 2004, [petitioner] began making concrete plans to carry out his intentions, and spoke to various individuals in connection with his planning. [Petitioner] ultimately decided that he needed to murder not only James, but his parents as well.

The case was tried to a jury beginning on August 11, 2008. The jury found [petitioner] guilty as charged. [Petitioner] waived jury sentencing. On November 12, 2008, the trial court sentenced him to life imprisonment without the possibility of parole for the murder in the first degree count, and ten year terms of imprisonment in the Missouri Department of Corrections on the remaining counts. The circuit court ordered that the three armed criminal action sentences be served concurrently with each other but consecutively to the murder in the first degree conviction, and that the sentences for attempted murder and burglary be served concurrently with each other but consecutively to both the first-degree murder and armed criminal action sentences.

(Doc. No. 9, Ex. 11, pp. 3-4).[1]

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984). It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254 (e)(1).[2] Because the state court's findings of fact have fair support in the record and because

---

[1]Citations are to the electronic record unless otherwise specified.

[2]"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## GROUND 1

In ground 1, petitioner claims that the trial court erred in allowing the State to present evidence that he invoked his right to counsel and refused to answer further questions in the middle of interrogation by police.

On direct appeal, the Missouri Court of Appeals held as follows:

> In his sole Point Relied On, [petitioner] argues that "[t]he trial court erred in . . . allowing the prosecutor to elicit testimony from Sergeant Jeffery Paul that when confronted with a witness's incriminating statement, [petitioner] abruptly stopped answering questions and asked to speak to his attorney . . . [and] prejudice resulted because the prosecutor's questioning was extensive and was deliberately intended to emphasize [petitioner's] invocation of his right to counsel as an inference of his guilt."
>
> *State v. Steger*, 209 S.W.3d 11, 17-18 (Mo. App. E.D. 2006), summarizes the principles necessary to our resolution of [petitioner's] claim:
>
>> In a criminal case, the Fifth Amendment guarantees each person shall be protected from compulsory self-incrimination. The privilege against self-incrimination includes the requirement that the police warn those taken into custody that they have the right to remain silent. In *Doyle v. Ohio*, 426 U.S. 610, 618 (1976), the United States Supreme Court held that the use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, is fundamentally unfair and violates the due process clause of the Fourteenth Amendment. This rule rests on the fundamental unfairness of implicitly assuring a suspect that his or her silence will not be used against him or her and then using his or her silence to impeach an explanation subsequently offered at trial.

Missouri cases hold that if a defendant exercises his or her right to remain silent or request an attorney, it is a fundamental violation of his or her constitutional rights for the State to use that silence against him or her. Silence includes not only a refusal to speak to the police, but also a request for an attorney. The State may not use post-arrest silence either as affirmative proof of the defendant's guilt or to impeach his or her testimony. However, post-arrest silence evidence may be admissible where no reasonable inference of guilt can be drawn merely from the fact the defendant was informed of his or her rights and then exercised them when he or she was not being questioned at the time he or she invoked those rights. Nonetheless, any evidence describing the conclusion of an interrogation must be carefully scrutinized. Evidence in regard to the conclusion of an interrogation which reveals that the defendant was failing to answer a direct charge of guilt is improper.

Once we determine a *Doyle* violation has occurred, this Court has the discretion to review the violation or violations in context of the entire record for plain error that affects substantial rights and constitutes a manifest injustice. The paramount concern is whether the inadmissible evidence had a decisive effect on the jury. To determine the effect on the jury, we must determine whether: (1) the government made repeated *Doyle* violations; (2) the trial court issued any curative remedies; (3) the defendant's exculpatory evidence is transparently frivolous; and (4) there is overwhelming evidence of guilt.

*Id.* (citations and quotations omitted); *see also State v. Brooks*, 304 S.W.3d 130, 133 (Mo. banc 2010). While neither party raises the issue, it is arguable that [petitioner] failed to properly preserve his argument for appeal, because trial counsel did not make a continuing objection as it pertained to this issue during Sergeant Paul's testimony (quoted below), or when the issue arose with another witness (Sergeant Timothy Fagan) later at trial. However, the Missouri Supreme Court has held that a similar analysis applies whether [petitioner] preserved or waived this objection:

When the error is preserved, the proper standard to apply is the *Chapman v. California*, 386 U.S. 18 (1967), harmless-beyond-a-reasonable-doubt standard where the state bears the burden of proving that a federal constitutional error was harmless beyond a reasonable doubt. *See Bass v. Nix*, 909 F.2d 297, 304 (8th Cir. 1990). This Court finds that the factors that inform the analysis for applying the *Chapman* standard to preserved error *Doyle* violations, however, are the same as those used to determine whether a nonpreserved *Doyle* violation error is a plain error affecting substantial rights and resulting in manifest injustice. These factors, once again, include the following: (1) whether the government made repeated Doyle violations, (2) whether any curative effort was made by the trial court, (3) whether the defendant's exculpatory evidence is "transparently frivolous," and (4) whether the other evidence of a defendant's guilt is otherwise overwhelming.

*State v. Dexter*, 954 S.W.2d 332, 340 n.1 (Mo. banc 1997); *see also Brooks*, 304 S.W.3d at 137.

The primary references to [petitioner's] invocation of his constitutional rights occurred during the testimony of Sergeant Jeffery Paul, which we quote at length:

> Q:     Now, in speaking with [petitioner] at this time, how would you describe his demeanor when you gave him this [inculpatory] information?

> A:     Almost indignant, mad that – he sat back, folded his arms and immediately said, **I want to talk to my lawyer**.

> [Petitioner's] Counsel: Objection. . . . I would object to any reference to [petitioner] asserting his rights to have an attorney present during the questioning. He has a right to do that. I don't think that's information that the jury needs to hear.

> The Court: I need to do what?

[Petitioner's] Counsel: I don't believe it's information that the jury needs to be aware of, that he invoked his right to have an attorney.

The State: I think it explains what happened.

The Court: Well, I know what happened. The objection's overruled.

Q:    Okay. I think, Sergeant Paul, we were on his demeanor that you said when you gave him this information, you called him indignant. What did you say? He leaned back –

A:    Leaned back, folded his arms.

Q:    And said what?

A:    **I want to speak to my lawyer before I answer any further questions**.

Q:    Now, how would you describe that demeanor compared to the demeanor before you gave him that information?

A:    Before that, he seemed almost cordial. You know, we had – we had talked with each other I believe at that point for – you know, during the course of the initial interview at his place of business, we had lunch together at the Pizza Hut there before we traveled back to Troop F. And in talking to him through there, it was all cordial.

Q:    So we went from cordial to indingant (ph.) Is that the right word?

A:    Indignant.

Q:    Indignant. Excuse me. Then **he asked for a lawyer**. At the point **he asked for a lawyer**, what did you do?

A:    I provided him my cell phone **so he could make a telephone call to his attorney**.

Q:    Did you leave him in a room by himself? Did you stay in the room?    What?

A:    I stayed with him when he made that, and **I believe he got the attorney's answering machine**.

Q:    Did you ask him any more questions?

A:    I did not.

Q:    Did [petitioner] make any more statements to you?

A:    No.

Q:    With the information that you had, did you pass the information on; the information that **he did not want to speak any more without a lawyer; invoked his rights**. Correct?

A:    Yes, sir.

Q:    Did you pass that along to other people in the Major Case Squad?

A:    I contacted the case commander, Lieutenant Paul Banta, and advised him that **he was seeking advice of counsel and he didn't want to answer any more questions at that time**.

. . . .

Q:    Okay.    How did that come about?

A:    **The attorney that [petitioner] tried to contact had called back and [petitioner] was given the opportunity to converse with him in a private office.    I believe he**

> **talked with the attorney for approximately ten minutes**.

Q:     And you weren't present during that conversation?

A:     No.

Q:     Were not able to hear even [petitioner's] side of that conversation?

A:     No, sir.

Tr. 462-65 (emphasis added). During Sergeant Timothy Fagan's testimony, the following brief exchange occurred: "Q: At the time that you made contact with [petitioner], did you know that he had exercised his rights and indicated that he did not want to speak without an attorney?   A: I did."   Tr. 696.

The State concedes that "the prosecutor's questions and the sergeant's testimony were admitted in error."   Br. at 20.   The first two prongs of the *Doyle* test – repeated references to [petitioner's] invocation of his rights and the lack of curative relief – would support a finding that reversible error occurred here (although we note that the prosecution did not refer to [petitioner's] silence in its closing arguments).

Despite the conceded *Doyle* violations, we conclude that [petitioner's] conviction must be affirmed.   First, we find that there is overwhelming evidence that [petitioner] in fact committed the crimes of which he was convicted.   In *State v. Dexter*, 954 S.W.2d 332, 342 (Mo. banc 1997), the Missouri Supreme Court described "overwhelming evidence of guilt" as follows:

> "[O]verwhelming evidence of guilt" means at a minimum that there is sufficient evidence to support a conviction without consideration of the inadmissible evidence, in this case the inadmissible references to appellant's silence.   There must be no reasonable doubt that appellant committed the crime, and the degree of prejudice that occurred by use of the inadmissible references to appellant's post-*Miranda* warning's silence must be insubstantial.

> "Overwhelming evidence of guilt is no easier to define than "manifest injustice," both being standards entirely dependant upon the facts of a particular case. "Manifest injustice" is a concept appellate courts may find impossible to define, but appellate courts "know it when they see it." Likewise, a test to determine whether there is overwhelming evidence of guilt in a particular case is not easily articulated. Perhaps the most vivid articulation in Missouri's jurisprudence is . . . if defendant were tried one hundred times on this evidence, with *or* without the detective's testimony, she would be convicted one hundred times.

*Id.* (citations and internal quotation marks omitted).

We begin with [petitioner's] admissions that he committed the crimes in question. When first questioned by the police regarding the homicide the day after it occurred, [petitioner] denied having any involvement in the crime, or knowing anything about why someone would want to murder the victim. Tr. 521. "A permissible inference of guilt may be drawn from the acts or conduct of a defendant, subsequent to an offense, if they tend to show a consciousness of guilt and a desire to conceal the offense or a role therein." *State v. Chaney*, 967 S.W.2d 47, 53 (Mo. banc 1998) (citation omitted).

Subsequently, [petitioner] was re-interviewed after Charles Machon told the police that prior to the victim's murder [petitioner] had asked Machon to give a false alibi for [petitioner]. Although [petitioner] became defensive after being told of Machon's statement, and asked to speak to his attorney, [petitioner] later changed his mind, waived his right to remain silent, and told the police in specific detail how he shot the victim. Tr. 702 n.2

> n.2 [Petitioner] was apparently also influenced to make his further statements by the fact that he learned from police that his wife was in custody; in response to that information, [petitioner] told the police that he would "like to tell what happened." Tr. 697-98.

After giving the police an oral account, [petitioner] wrote a

statement describing what had happened, Tr. 702:

> Bob drove the car and we passed the Windmanns on the interstate. We took the Warrenton exit to beat them home. Bob dropped us off in front of the house. I threw a brick through the lower door to gain entry. I was very scared and nervous. The other guy was nervous too and he accidentally fired a round off into the floor.
> I had told him I wanted to plant some marijuana in James's room and vandalize the house some. I also intentions [sic] to shoot James for what he did to Taylor, if possible.
>
> The Windmanns arrived home maybe five minutes after we entered. I was scared and didn't know what to do. We tried to hide in the kitchen and figure out what to do, but Charlie came in from the deck and surprised us. . . .
>
> Charlie walked back towards the bathroom and was gone only a minute or two. When Charlie came back, he turned on the kitchen light and I panicked. I stood up and shot him. I didn't know what to do and I can't remember every step I took.

Tr. 715-16.

After completing his written statement, [petitioner] agreed to make another oral statement to the police, so that it could be audio-taped. Tr. 703. While the three confessions were not identical, they were consistent with one another. Tr. 710.

Other witnesses provided compelling, direct testimony that [petitioner] had planned for months to murder the Windmanns in cold blood. A large number of [petitioner's] family and friends had detailed knowledge regarding [petitioner's] intent to murder the Windmanns. Indeed, the evidence indicates that several of these people were complicit in the crimes.

The strongest testimonial evidence came from Curtis Martin, who was present with [petitioner] in the Windmann's home when [petitioner] shot and killed the victim. Martin testified that he was friends with [petitioner], and that they had bonded over their mutual interest in firearms. Martin testified that [petitioner] often

spoke of killing James Windmann in 2004. Tr. 606. Specifically, [petitioner] told Martin that [petitioner] wanted to kill James Windmann because he had molested Windmann's daughter, Taylor. Tr. 614.

Martin testified that over time, [petitioner's] plan of murdering James Windmann became more detailed and specific. For example, [petitioner] told Martin that he had found matching paint so that he could alter the numbering on his license plate in case someone saw their car leaving the scene of the crime. Tr. 610. Martin further testified that [petitioner] asked him to serve as his "backup" in the crime "[i]n case something happened to him – not to let nothing happen to him." Tr. 612. Prior to heading to the scene of the crime on September 19, 2004, [petitioner's] father (Joe Snyder), brother (Robert Snyder), and wife (Jamie Snyder) were all present at his home with him, and they were all apparently aware of [petitioner's] "plan." Tr. 616-17.

Martin testified that when he got in [petitioner's] car, he learned that [petitioner] had already placed shotguns, a pistol, and "a couple knives" inside. Tr. 618. When they were driving to the Windmann's home, [petitioner] told Martin that it was [petitioner's] intent not only to kill James Windmann, but also to murder his parents, Charles and Alice Windmann. Tr. 612.

Martin described [petitioner's] preparations when they arrived at the scene of the crime. Martin testified that he and [petitioner] wore gloves, and "taped up our sleeves and our ankles . . . [s]o no hair would fall out." Tr. 623. They did not bother covering their faces because they did not need to hide their identity, since [petitioner] was "going to take them all out." Tr. 625.

After entering the Windmann home, Martin testified that he and [petitioner] hid and lay in wait for all three Windmanns to enter the home so that [petitioner] could murder them. Tr. 631. n.3 Shortly after Charles Windmann entered the home, [petitioner] stood up and shot him with a shotgun. Tr. 634. After waiting awhile for the other two Windmanns to enter the home so that [petitioner] could shoot them as well, Martin testified that it became apparent that Alice and James Windmann had fled, which led [petitioner] to exclaim "FUBAR" (meaning, "Fucked Up Beyond All Recognition"). Tr. 638.

     n.3 [Petitioner] was aware that none of the

> Windmanns would be home on the evening of September 19, 2004, because Charles, Alice and James Windmann were meeting Jamie Snyder at the customary exchange point to return Taylor Windmann to her mother's custody.

After leaving the Windmann home, Martin testified that [petitioner] took the methodical steps he had previously planned to cover up his involvement in the crimes. Communicating by walkie-talkie, Martin and [petitioner] met [petitioner's] brother, who was driving [petitioner's] car and was supposed to wait for Martin and [petitioner] while they were inside the Windmann house. Tr. 640-41. The group switched the previously altered license plates with authentic ones; [petitioner's] father later took the guns used in the crime and cleaned them. Tr. 641, 647. Moreover, while Martin and [petitioner] were committing the crimes, it was Martin's understanding that [petitioner's] father and wife were making phone calls on [petitioner's] behalf, so that he would have an alibi for the time period in which the crimes were committed. Tr. 646. Finally, Martin testified that after shooting the victim, [petitioner] showed no remorse and in fact was laughing regarding the conduct which caused Charles Windmann's death. Tr. 644.

Compelling testimony was also provided by [petitioner's] "life long friend," Timmy Ponder. Ponder testified that [petitioner] was obsessed with the idea of murdering James Windmann, and that he constantly talked to Ponder about the subject. Tr. 536-37. Ponder testified that the subject of killing James Windmann came up nearly every time he saw [petitioner] between May and September 2004, which Ponder estimated was approximately fifty times. Tr. 536, 544.

Ponder testified that in July 2004, he went to the Windmanns' home with [petitioner] to investigate how [petitioner] could commit the crimes; during that reconnaissance, [petitioner] told Ponder that it was his intent to murder James Windmann that day, if presented with the opportunity to do so. Tr. 538-542. When they arrived at the Windmann's home, Ponder waited in the car while [petitioner] walked around the home with an armed weapon. Tr. 542. [Petitioner] did not see anyone in the home, and the two ultimately left. Tr. 542.

Ponder testified that in August 2004, [petitioner's] goal changed

from just killing James Windmann to also killing Windmann's parents so that [petitioner] could more easily gain custody of Taylor. Tr. 544-45. Two or three days before the murder, Ponder received a phone call from [petitioner] telling him that "the 19th was the day it was going to happen." Tr. 547. During this conversation, Ponder pledged to assist [petitioner] in his endeavors, but Ponder testified that at no time did he actually intend to help [petitioner], and when [petitioner] called him on the 19th, he told [petitioner] that he could not go because his "wife was coming home early from work." Tr. 546-47. Later that day Ponder heard back from [petitioner]; [petitioner] told him that it was "taken care of." Tr. 550.

Charles Machon testified that [petitioner] called him prior to the murder to tell Machon that [petitioner's] father would be calling him in the future if Machon would agree to provide a false alibi for [petitioner]. Tr. 576-79. Machon testified that on September 19th he in fact received a call from [petitioner's] father, and that when the police interviewed him regarding the crime Machon told the police that [petitioner] wanted him to provide the police a fake alibi. Tr. 582, 588.

We also note that Alice and James Windmann testified that, when they were at the neighbors' home immediately following Charles' murder, they saw a vehicle driving back and forth on a nearby roadway. Tr. 304-07, 362. Alice testified that the driver and sole occupant of the vehicle was "kind of looking at us." Tr. 306. The vehicle they identified as loitering in the area (State Exhs. 13, 14, 15) was [petitioner's] car. Tr. 619.

Although this is merely a summary of some of the most significant testimony presented at trial, we conclude that this evidence, when taken in conjunction with [petitioner's] confessions, is "overwhelming evidence" that [petitioner] committed the charged crimes.

We also conclude that, under the fourth prong of the *Doyle* test, "the defendant's exculpatory evidence [was] transparently frivolous." *Steger*, 209 S.W.3d at 18. At trial, [petitioner's] trial counsel conceded that "[o]ne of the issues that is not in dispute in this matter is the fact that [petitioner] went to the Windmann home and he's the individual that shot Charles Windmann. That is not in dispute." Tr. 818-19. Indeed, [petitioner's] trial counsel began her closing arguments by stating that "most of what you've

heard this week, the evidence you've heard this week is not in dispute." Tr. 817. Instead, [petitioner's] theory of defense was that he did not intend to cause the death of any of the Windmanns, but rather that [petitioner] wanted only to plant marijuana on James Windmann in order to obtain custody of Taylor Windmann and that [petitioner] simply panicked when he shot Charles Windmann. Tr. 834-35. (The claim that [petitioner] intended only to plant marijuana is inconsistent with his written statement, where he stated that, when he went to the Windmann home on September 19th, he had "intentions to shoot James for what he did to Taylor, if possible.") [Petitioner's] trial counsel argued in closing that [petitioner] should be found guilty of the lesser included offense of murder in the *second* degree, and that he should be found not guilty of the attempted murder charges. Tr. 837-38.

The only witness called in [petitioner's] defense was Officer Raymond Floyd, who had previously testified on behalf of the State. During the defense case, Floyd could only add that Martin initially told the police (prior to admitting that he and [petitioner] committed the crimes) that he and [petitioner] were eating pizza and looking for car parts on the night the murder occurred. Tr. 768-70. This testimony, of course, does nothing to rebut the testimony of Martin and Ponder that [petitioner] had formed a long-standing plan to commit a triple-homicide; moreover, Martin's initial denial of any involvement in the crimes is inconsistent with [petitioner's] own oral and written statements to police, and his trial theory that he killed Charles Windmann, but had done so in a fit of panic. Simply put, [petitioner] failed to adduce at trial any meaningful evidence to counteract the State's theory that he had planned to kill all three Windmanns, and that [petitioner] in fact deliberately caused the death of Charles Windmann. Overall, we conclude that no meaningful exculpatory evidence, if any was available, was presented at [petitioner's] trial.

What we have said to this point establishes the lack of any reversible error. We note, however, that an additional reason may exist for finding the erroneously admitted testimony to be harmless. While [petitioner's] invocation of his right to consult a lawyer may have allowed the jury to infer his consciousness of guilt, [petitioner's] request for an attorney does not indicate *what crime* he might have believed he was guilty of. [Petitioner] himself later admitted breaking into the Windmann home and shooting Charles Windmann, and his argument at trial was the [sic] he should be convicted of second-degree murder. Thus,

[petitioner's] own statements and trial arguments acknowledge that, at the time he invoked his right to counsel, he was aware of his guilt of a serious felony or felonies. There is nothing in his invocation of his constitutional rights that necessarily establishes his consciousness of guilt *of the crimes for which he was convicted*, as opposed to the crimes he himself admitted committing.

In these circumstances, and despite the conceded *Doyle* violation, we conclude that the error was harmless beyond a reasonable doubt, and cannot support reversal.

(Doc. No. 9, Ex. 11, pp. 5-16).

The resolution of ground 1 by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).[3]

Ground 1 is denied.

## <u>GROUND 2</u>

In ground 2, petitioner contends that trial counsel was ineffective for failing to allow petitioner to testify on his own behalf at a suppression hearing. In order to succeed on a claim of ineffective assistance of counsel, petitioner must establish that: (1) his counsel's performance

---

[3]According to the concurrence of Justice O'Connor, joined by four other members of the Court, "under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413, 120 S.Ct. at 1523.

was unreasonable as viewed in the totality of the circumstances; and (2) his defense was prejudiced by counsel's action in that there is a reasonably probability that, but for counsel's unprofessional acts, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694-95 (1984); Schaeffer v. Black, 774 F.2d 865, 867 (8th Cir. 1985). Reasonably effective assistance of counsel may be defined as the skill and diligence that a reasonably competent attorney would exercise under similar circumstances. See, e.g., Strickland v. Washington, 466 U.S. at 687-90. Judicial scrutiny of counsel's performance must be highly deferential, id. at 689, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

On appeal from the denial of his Rule 29.15 motion, the Missouri Court of Appeals disposed of petitioner's claims as follows:

> In his sole point on appeal, [petitioner] contends that the trial court erred in denying his motion for post-conviction relief because he allegedly proved that he was denied his rights to due process of law and effective assistance of counsel. [Petitioner] claims that his trial counsel was ineffective "for failing to call [petitioner] to testify in support of his motion to suppress hearing knowing that he wished to testify that his statement [to police] was coerced and involuntary." He argues that competent counsel would have called him to testify, knowing that [petitioner] wanted to testify about the circumstances surrounding his confessions.
>
> A convicted defendant can prevail on a claim of ineffective assistance of counsel only after proving (1) that trial counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances; and (2) that counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Prejudice is established if there is a "reasonable probability" that, but for counsel's unprofessional errors, the result would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of

the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

## A. Credibility Determinations are Within the Discretion of the Trial Court

In evaluating whether [petitioner's] trial counsel provided him with ineffective assistance, the trial court heard testimony from both [petitioner's] trial counsel and from [petitioner] himself. Trial counsel testified concerning her decision not to present [petitioner's] testimony about the circumstances of the confessions, saying that she did not think it would have made a difference in the outcome of the hearing based on the evidence. [Petitioner] testified that he was not allowed to testify at the suppression hearing regarding his mental and physical condition at the time he gave his confessions. He was then allowed to offer the testimony that he wanted to offer five years previously regarding the circumstances of his confessions. After hearing evidence from [petitioner], his trial counsel and the State, the trial court ruled against [petitioner] on his post-conviction relief motion and determined that his "testimony regarding his mental state at the time of his confessions" was "incredible." [Petitioner] asserts that the court's findings leave a definite and firm impression that a mistake was made by the court.

As noted above, our review is limited to whether the trial court's findings of fact or conclusions of law are clearly erroneous. *Hendrix*, 369 S.W.3d at 96. [Petitioner] makes no argument that the trial court made any error of law. Rather, [petitioner] argues that the court's determination that [petitioner] was not given ineffective assistance of counsel is an erroneous finding of fact because the court found his trial counsel's testimony to be credible. [Petitioner] does not elaborate on how the court's determination as to the credibility of witnesses leaves the impression that a mistake has been made, other than to point out that the court simultaneously found trial counsel's testimony credible and [petitioner's] incredible, with the implication being that either both must be believed or neither believed. We disagree.

It is well established that credibility determinations are within the discretion of the trial court. In reviewing the trial court's decision, we must defer to that court's credibility determinations. *Colbert v. State*, 7 S.W.3d 471, 474 (Mo. App. W.D. 1999) (citations omitted). Even if not contradicted, the trial court may disbelieve the testimony of the movant or any other witness at an evidentiary hearing. *Id.*

The trial court heard testimony regarding the extent to which [petitioner] and his trial counsel discussed [petitioner] being able to testify about his confession. The court also heard the testimony that [petitioner] allegedly would have offered six years ago at the suppression hearing, if he had been called by the attorney who was representing him at that time. In reaching its conclusions, the trial court was required to make determinations regarding the credibility and weight to be accorded to trial counsel and [petitioner].

In its November 20, 2011 order, the trial court made an express finding that the testimony of [petitioner] was not credible: "[t]he Court finds Movant's testimony regarding his mental state at the time of his confessions to be incredible. The Court further finds that his testimony at the suppression hearing would not have changed the Court's ruling." As this finding was well within the trial court's discretion, it should not be disturbed. *Kenney v. State*, 46 S.W.3d 123, 128 (Mo. App. W.D. 2001).

## B. First Prong of *Strickland* Test – Trial Counsel's Actions Were Trial Strategy

In further support of his assertion of error by the trial court, [petitioner] points to his trial counsel's testimony at the October 18, 2011, post-conviction evidentiary hearing. There trial counsel stated that (1) she did not recall specifically why she did not present the circumstances of [petitioner's] confession to the court, (2) she guessed she thought that [petitioner's] private attorney who filed the motion "had already had the hearing," and (3) she "assumed that it had been presented then." Although trial counsel was not present at the time the hearings on [petitioner's] motion to suppress took place because he had private counsel at that time, [petitioner] alleges that a reasonable attorney in similar circumstances would have "read the motion hearing and presented the additional evidence rather than assume prior counsel protected the client's constitutional rights." [Petitioner's] argument presumes that had trial counsel reviewed the evidence presented over a year before at the suppression hearing and determined that [petitioner's] testimony would have caused the trial court to reach a different result, that the trial court would have allowed it. Trial counsel also testified as follows:

Q:    And do you recall why you did not present any more evidence?

A:    I don't think that there was anything in

addition that we wanted to present.

It is well established that decisions as to what evidence to present at a suppression hearing rest with the attorney. "'Generally, the selection of witnesses and the introduction of evidence are questions of trial strategy and virtually unchallengeable.'" *Johnson v. State*, 333 S.W.3d 459, 463-64 (Mo. banc 2011) (citation omitted). It is also well established that an ineffective assistance of counsel claim will not stand when it refers to actions taken or not taken as a result of trial strategy decisions. *Hurst v. State*, 301 S.W.3d 112, 117-18 (Mo. App. E.D. 2010). We do not find error in the court's denial of [petitioner's] 29.15 motion for ineffective assistance of counsel because the decision not to present [petitioner's] testimony regarding his confession at the suppression hearing was a result of trial strategy. Notably, based on the trial court's determination that [petitioner] was *not* credible and that his testimony would *not* have changed the outcome of the suppression hearing, it appears as if trial counsel's decision was well-founded.

Because trial counsel's decision not to present [petitioner's] testimony about the circumstances surrounding his confession at some point before trial was a strategic decision upon which an ineffective claim cannot stand, we agree that trial counsel was not ineffective. Thus, [petitioner] has failed to establish that the first prong of the *Strickland* test has been met.

## C.    Second Prong of *Strickland* Test – No Reasonable Probability of a Different Outcome

Since the first prong has not been met, we are not required to analyze the second prong because both prongs must be proven in order for a post-conviction claim of ineffective assistance of counsel to be granted. *Strickland*, 466 U.S. at 687. *Ex gratia*, we note that [petitioner] has also failed to establish the second prong of the *Strickland* test, prejudice. Based on the trial court's express finding and conclusion, after hearing [petitioner's] testimony, that [petitioner's] testimony was not credible and that it would not have changed the outcome of the suppression hearing had it been presented, no prejudice was shown. Since the trial court who heard [petitioner's] testimony was also the court that handled the suppression hearing, it is more than speculation that the result would have been the same and that no prejudice occurred in the failure to present [petitioner's] testimony at that hearing.

### D. Not Testifying at Suppression Hearing did Not Violate Constitutional Rights

In addition, [petitioner] alleges that the court erred in not finding that his counsel's failure to allow him to testify at the suppression hearing trampled upon his constitutional rights. [Petitioner] argues that "because the court found that the trial attorney was credible it must also have found that counsel failed to allow Appellant to testify in violation of his constitutional rights." In *State v. Sanders*, the defendant argued that he did not authorize the waiver of his presence at a suppression hearing, and hence, he was deprived of his constitutional right to be present during his entire trial. 539 S.W.2d 458, 461 (Mo. App. E.D. 1976). He asserted that he had an unqualified right to be present at the pre-trial motion to suppress, and there could be no waiver without his appearance without his express authority. *Id.* The defendant relied on Article I, § 18(a) of the Missouri Constitution which provides: "[t]hat in criminal prosecutions the accused shall have the right to appear and defend, in person and by counsel . . ." *Id.*

The Eastern District of this Court held that the waiver of the defendant's presence by his counsel did not result in a violation of constitutional rights. The court's reasoning is applicable to the instant issue:

> [W]e find no deprivation of defendant's constitutional or statutory rights by his counsel's waiver of his appearance at the motion to suppress the oral confession. It is manifest that the decision to file the motion to suppress the oral confession was a matter of pre-trial strategy. Whether or when the particular legal maneuver of filing a motion to suppress is to be exercised is a matter for the counsel's determination. *State v. Brownridge*, 506 S.W.2d 466 (Mo. App. E.D. 1974). It was within the defense counsel's discretion whether to file the motion to suppress the oral confession. It was also within the counsel's direction whether the motion to suppress should be vigorously pursued, or, as in this case, after hearing the State's evidence from two witnesses as to the voluntariness of the confession, whether further pursuit of the motion would be unavailing. Defendant's counsel, thus, had the option of filing or not filing the pre-trial motion to

> suppress the confession, or, once having filed the
> motion, of discontinuing it at anytime – all within his
> own discretion as part of his own strategy in the
> conduct of the case. Waiving defendant's
> appearance at this particular pre-trial motion – which
> was done – was within the defense counsel's
> discretion.

*Id.* at 461.

As noted in *Sanders*, the decision to even file pre-trial motions that
could later invoke a hearing rests with trial counsel, not the
defendant. By logical extension, the defendant does not have a
right to testify in a situation that the trial counsel has the sole
authority to initiate and control. The reasoning in *Sanders* has
since been uniformly applied. *See generally, Jackson v. Norman*,
2011 WL 3104538, at *17-18 (E.D. Mo. July 27, 2011) (no error by
attorney in failing to request a hearing on motion to suppress and
failing to call defendant at such a hearing); *State v. Molasky*, 655
S.W.2d 663, 669-70 (Mo. App. E.D. 1998) (holding that because the
waiver of defendant's presence at suppression hearing was entirely
within discretion of counsel, the first prong of the *Strickland* test
was not met); *State v. Malone*, 951 S.W.2d 725, 732 (Mo. App.
W.D. 1997) (holding that the waiver of defendant's presence at
suppression hearing was within counsel's discretion); *Pinkard v.
State*, 694 S.W.2d 761, 762 (Mo. App. E.D. 1985) (holding that the
selection of witnesses and evidence to be presented at a hearing is a
matter of litigation strategy and professional judgment, and is an
inadequate ground upon which to rule representation ineffective).
"We also may not grant post-conviction relief due to an attorney's
failure to call a movant to testify at a suppression hearing."
*Jackson*, 2011 WL 3104538, at *18 (citing *Pinkard*, 694 S.W.2d at
762).

Although [petitioner] was present at the suppression hearing with
his former counsel and present at the pretrial hearing with his new
counsel, his claim that he should have been allowed to testify still
falls short of error by either counsel because "[w]ithout more, advice
from counsel not to testify is not deemed ineffective assistance of
counsel if it might be considered sound strategy." *Morrison v.
State*, 75 S.W.3d 893, 897 (Mo. App. S.D. 2002) (citing *Rousan v.
State*, 48 S.W.3d 576, 585 (Mo. banc 2001)).

Last, we note that even if [petitioner] had testified at the suppression

hearing regarding the circumstances surrounding his confession, and assuming, *arguendo*, that the trial court believed that he was coerced into confessing and sustained his motion to suppress and kept the confession out of evidence, there was still overwhelming evidence of [petitioner's] guilt from other sources at trial. "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. "The purpose [of the Sixth Amendment] is simply to ensure that criminal defendants receive a fair trial." *Prince v. State*, No. WD 74478, 2013 WL 150948, at *8 (Mo. App. W.D. Jan. 13, 2013) (citing *Strickland*, 466 U.S. at 689).

For the foregoing reasons, this point is denied.

(Doc. No. 9, Ex. 17, pp. 8-16).

The resolution of ground 2 by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 412 (2000). Applying the Strickland standard of review to the facts as set forth in the record, the Court finds that counsel was not ineffective.

Ground 2 is denied.

## **GROUNDS 3, 4, & 5– PROCEDURAL DEFAULT**

Petitioner's remaining grounds are procedurally defaulted. In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court held:

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or

> demonstrate that failure to consider the claims will result in a
> fundamental miscarriage of justice.

<u>Id.</u> at 750. Cause, actual prejudice, and the probability of a "fundamental miscarriage of justice" are to be judged under criteria set out in <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977), and <u>Murray v. Carrier</u>, 477 U.S. 478 (1986). <u>Coleman</u>, 501 U.S. at 748-50.

A review of the record reflexts that, this petition is the first time petitioner has raised ground 3, and although petitioner presented the claims set forth in grounds 4 and 5 in his amended Rule 29.15 motion, petitioner did not raise them on appeal from the denial of that motion. Therefore, those claims are procedurally defaulted and may not be reviewed by this Court unless petitioner can demonstrate cause and actual prejudice, or that failure to consider his claims will result in a fundamental miscarriage of justice. <u>Coleman</u>, 501 U.S. at 750. The Court will not reach the "prejudice" component of the analysis unless it first finds that the petitioner has demonstrated "cause" for his procedural default.

Petitioner does not present any valid explanation for why he has never raised ground 3 or for why grounds 4 and 5 were not pursued on appeal from the denial of his Rule 29.15 motion and, therefore, has failed to demonstrate cause for his procedural default. As a result, we do not consider prejudice. The Court, however, can still reach the merits of his claims if petitioner can show that he is "probably actually innocent" of the crimes for which he was convicted. <u>Bowman v. Gammon</u>, 85 F.3d 1339, 1346 (8th Cir. 1996), <u>cert. denied</u>, 520 U.S. 1128 (1997). To demonstrate his innocence, petitioner must satisfy a two-part test: First, he must support his allegations of constitutional error "with <u>new</u> reliable evidence. . . that was not presented at trial." Second, he must establish "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." <u>Id.</u>, <u>citing</u> <u>Schlup v. Delo</u>, 513 U.S. 298 (1995).

Petitioner fails to make this showing.

Petitioner has failed to show cause for his default of grounds 3, 4, and 5. He does not show that a manifest injustice will occur if these grounds are not reviewed on the merits, and he has failed to meet the Schlup standard for actual innocence. Id. Therefore, federal review of grounds 3, 4, and 5 is barred.

Grounds 3, 4, and 5 are denied.

## CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." Tennard v. Dretke, 542 U.S. 274, 276 (2004). Because petitioner has not met this standard, a certificate of appealability will be denied. See 28 U.S.C. § 2254, Rule 11(a).

Accordingly, it is **ORDERED** that:

(1) the above-captioned petition for a writ of habeas corpus is denied;

(2) this case is dismissed with prejudice; and

(3) the issuance of a certificate of appealability is denied.


   /s/ Dean Whipple
DEAN WHIPPLE
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated:   August 27, 2013.